IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TIMOTHY E. TWEED, )
)
    Plaintiff, )
)
v. ) 1:17-cv-01417-LMB-JFA
)
JEFFERSON B. SESSIONS, III, ATTORNEY )
  GENERAL, )
)
    Defendant. )

## MEMORANDUM OPINION

Timothy E. Tweed ("Tweed" or "plaintiff"), a former Firearms Specialist employed by the Federal Bureau of Investigation ("FBI"), in its Quantico, Virginia facility, has filed a four-count Complaint pro se against Jefferson B. Sessions, III, the Attorney General of the United States, ("Sessions" or "defendant") in his official capacity, in which plaintiff alleges to have been the victim of employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") based on his gender (male) and religion (Pentecostal Christian) and on retaliation for engaging in protected EEO activity (Counts 1 and 2, respectively).[1] Compl. [Dkt. No. 1] ¶¶ 91-100. The Complaint also alleges in Count 3 that defendant violated the Religious Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), id. at ¶¶ 101-02, and in Count 4 that defendant inflicted emotional distress and tortiously interfered with prospective economic advantage in violation of Virginia state law, id. at ¶¶ 103-10.

---

[1] Although Sessions is the only defendant named in the caption of the Complaint, plaintiff lists eleven additional FBI officials as defendants in the section of the Complaint describing the parties, see Compl. [Dkt. No. 1] ¶¶ 3-13; however, throughout the Complaint, plaintiff inconsistently refers to "the defendant" and "the defendants," compare id. at ¶¶ 94, 100, 104-05, 108 ("Defendant") with id. at ¶ 92 ("Defendants"). Regardless of who is a defendant in this civil action, the Court's analysis of the motions would not change.

For relief, plaintiff seeks $10 million to compensate him for lost wages, accrued leave time, prejudgment interest and an order declaring that defendant violated Title VII and permanently enjoining him from further discriminatory and retaliatory practices. Id. at ¶¶110 (a)-(b).

Before the Court are defendant's Motions to Dismiss for Lack of Jurisdiction and for Failure to State a Claim [Dkt. Nos. 11 and 12] ("Def. Mtns. Dismiss"), to which plaintiff has filed an opposition [Dkt. No. 21] ("Pl. Opp'n"). Defendant has filed a reply brief [Dkt. No. 27] ("Def. Reply"), and the Court finds that oral argument will not assist the decisional process. For the reasons that follow, defendant's motions will be granted and this civil action will be dismissed.[2]

I. BACKGROUND

The following factual findings are based on the facts contained in the Complaint and the 41 exhibits attached to it and supplemental facts by plaintiff, as well as documents attached to defendant's motions to dismiss.[3]

A. **Plaintiff's Employment History**

Plaintiff was hired by the FBI as an Investigative Specialist on October 16, 2005. Compl. [Dkt. No. 1] ¶ 25; Ex. C [Dkt. No. 1-4] 1. After serving as an Intelligence Analyst in the FBI's Louisville, Kentucky field office, plaintiff was assigned to the Laboratory Division's ("LD") Firearms/Toolmarks Unit ("FTU") as a Firearm Specialist on December 20, 2009. Compl. [Dkt.

---

[2] Plaintiff attached over 100 pages of exhibits to the Complaint, which primarily concern the FBI's intensive investigation into his conduct, Exs. A-OO [Dkt. Nos. 1-2 through 1-41], and moved to supplement the Complaint on April 19, 2018 with additional facts, [Dkt. No. 22], which the Court granted [Dkt. No. 29]. These exhibits and additional facts may be considered by the Court in resolving the motions to dismiss without converting the motions into ones for summary judgment. See Info Planning & Mgmt. Serv. Inc. v. Dollar Gen. Corp., 2016 U.S. Dist. LEXIS 883, at *4 (E.D. Va. Jan. 5, 2016).

[3] Defendant attached to his brief supporting his motions to dismiss two letters regarding plaintiff's suspension from the FBI and also documents concerning plaintiff's EEO complaint. The Court is permitted to consider these documents because they were integral to the decision to suspend plaintiff's security clearance and were part of the EEOC proceeding. See id.

2

No. 1] ¶¶ 26-28; Ex. C [Dkt. No. 1-4] 1. As a Firearm Specialist, he was responsible for the receipt, inventory, and destruction of firearms the FBI obtained from forfeiture, abandonment, court-ordered destruction, donation, interagency transfer, or which the FBI had purchased. Ex. T [Dkt. No. 1-21] 3. To track the receipt of these firearms, the FTU uses the Reference Firearms Collection ("RFC") database in which every firearm the FTU receives is assigned a Reference Identification number ("RID") to account for its receipt and status. Id.

Heather Seubert ("Seubert") became plaintiff's supervisor in 2010. Compl. [Dkt. No. 1] ¶ 30. Plaintiff had previously been rated as "Excellent" in his Performance Appraisal Report ("PAR") for 2010; however, after Seubert became his supervisor, his 2011 PAR rating was reduced to "Successful" and his 2012 PAR was further reduced to "Minimally Successful." Id. ¶¶ 40-41, 43; Ex. KK [Dkt. No. 1-38] 4. Seubert told plaintiff that his 2011 rating was lowered because he had not destroyed "firearm boxes and sleeves," as required, Compl. [Dkt. No. 1] ¶ 41, and his 2012 PAR was lowered due to his "consistent resistance to; [sic] document his workflow process, provide hard numbers concerning the current status of existing weapons, allow others to help him perform his job to help decrease the accumulating backlog of inventoried weapons, and clean and organize his workspace, fostered discord within the unit [sic]," Ex. F [Dkt. No. 1-7] 3. Although plaintiff was not placed on a performance improvement plan ("PIP"), after Seubert consulted with upper management and human resources, the decision was made to outline specific tasks in his "2012 PAR which, if not completed, would trigger [him] being placed on a PIP." Id.

On January 27, 2013, plaintiff was "involuntarily transferred" from the FTU to a temporary duty assignment in the Laboratory Planning and Budget Unit ("PBU"). Compl. [Dkt. No. 1] ¶ 46. The pleadings characterize that transfer as being based on Seubert having "ongoing challenges" supervising plaintiff. Ex. F [Dkt. No. 1-7] 4. On April 17, 2013, the assignment was made

3

permanent. Ex. O [Dkt. No. 1-16] 1-2. Although plaintiff cites this transfer as an example of an adverse employment action, this change in position did not impact his "current grade or pay" because both positions were at the GS-11 level. Id. After his transfer, Seubert selected John B. Webb ("Webb"), who was then the Reference Firearms Collection Program Manager, to oversee plaintiff's Firearms Specialist duties and rotated additional FTU employees to assist him with the daily responsibilities of that unit.[4] Ex. T [Dkt. No. 1-21] 2-3.

To perform his duties, Webb needed to clean the disposition suite to arrange for an organized work area for FTU personnel and to conduct an audit of the RFC database to account for the number and status of firearms. Id. at 3. The audit, which required hundreds of hours of extensive work, was completed on April 24, 2013 and revealed no account for 14 firearms which had been under plaintiff's control. Compl. [Dkt. No. 1] ¶ 60; Ex. T [Dkt. No. 1-21] 1-9. In addition, there were concerns about over 400 firearms not having been properly cataloged. Id. The results of the audit were referred to the FBI's Inspection Division ("INSD"), which on May 22, 2013, initiated an investigation into 13 of the missing firearms. Compl. [Dkt. No. 1] ¶ 62; Ex. V [Dkt. No. 1-23] 1. The investigation was overseen by Supervisory Special Agent ("SSA") Lisa Locascio ("Locascio").[5] Id.

---

[4] As evidence of his gender discrimination claim, plaintiff alleges that Seubert proposed Andrea Gunning ("Gunning"), a female Firearms Examiner Trainee, to fill his position, Compl. [Dkt. No. 1] ¶ 52; however, there is no evidence in the record that Gunning ever actually filled the position and plaintiff's allegation is contradicted by the FBI's report, which stated "[t]o ensure continued operation of the disposition program, Mr. John B. Webb, Reference Firearms Collection Program Manager, was selected by Unit Chief Heather Seubert, FTU, to provide oversight of the Firearms Specialist's duties. Although Mr. Webb has performed most of these duties, additional FTU employees were identified to assist with the daily responsibilities on a rotating basis." Ex. T [Dkt. No. 1-21] 2. In sum, there is no evidence in this record, or even an unambiguous allegation, that a female replaced plaintiff.

[5] Plaintiff alleges that during the investigation Seubert and Locascio "began a relationship" by friending each other on Facebook. Compl. [Dkt. No. 1] ¶¶ 77-79.

On July 16, 2013, a letter was presented to former FBI Director James Comey "asking for Christian civil rights to be better defended and identified in areas where Christians were being discriminated." Compl. [Dkt. No. 1] ¶ 68. Plaintiff was one of several FBI employees who signed the letter, which stated, in part, that:

> Those who adhere to Christianity are systematically offended, mistreated and discriminated against," for example, because "every June, thousands of Christian FBI employees are forced to endure the FBI's active promotion of homosexuality, bisexuality and transsexuality in the workplace, despite the fact that these lifestyles are contrary to their protected religious beliefs. Not only does this create a hostile work environment, but for those who find these celebrations inappropriate, nearly every announcement about an LGBT event technically meets the FBI's own definition for "sexual harassment." Ex. Z [Dkt. No. 1-27] 4.

In late July 2013, employees in the LD "voiced their concern for their safety when dealing with Mr. Tweed and his behavior" based on religious quotations appearing at the bottom of his emails near his signature block that were perceived as threatening in nature to the recipients.[6] Compl. [Dkt. No. 1] ¶ 70; Ex. AA [Dkt. No. 1-28] 1.

On September 27, 2013, the INSD investigation was expanded to include potential security violations based on the following allegations:

> Mr. Tweed refused to follow instructions and guidance provided by his [Unit Chief ("UC")] on multiple occasions. Mr. Tweed hid the fact he was keeping a "shadow" record of firearms in a FBI LD Notebook, despite the fact his job duties mandated he keep these records on a computer database. He removed this notebook from the FBI LD and stated he took it home and relinquished it to his wife for safekeeping. During his interview, he initially stated he did not know where the notebook was and then stated it was at his residence. He conducted unauthorized firearms analysis [sic] upon request from FBI Offices instead of referring them to certified firearms examiners....Ex. EE [Dkt. No. 1-32] 1.

---

[6] There is no allegation in the Complaint or evidence in the record that plaintiff was ever prohibited from quoting such passages in his emails or that including religious quotations in his emails was a required practice of his religion. Other than a passing reference to the reactions of some employees to these quotes, there is no evidence in this record that these reactions were a material contribution to any of the employment decisions in this action.

On October 13, 2013, the INSD referred its investigation report to the OPR for "adjudication." Def. Ex. 5, [Dkt. No. 13-5] 7.

As part of its evaluation of the allegations in the INSD Report, the OPR required plaintiff to take a polygraph, which was scheduled for October 29, 2013. Ex. NN [Dkt. No. 1-40] 16. On October 28, he informed the INSD SSA that he was declining to take the test based primarily on his distrust of polygraph machines. Id. After being ordered to appear for the polygraph, he appeared for the test but ultimately refused to take it. Id. Plaintiff alleges that when he arrived, Locascio "belittled" his religion by making him "swear on a stack of Bibles" and referenced his July 2013 letter concerning Christian FBI employees' civil rights. Compl. [Dkt. No. 1] ¶ 81.

On November 12, 2013, the OPR sent the INSD's investigation report to plaintiff. Ex. KK [Dkt. No. 1-38] 4-17. Based on the report's findings, the OPR recommended that plaintiff be dismissed from the "rolls of the FBI" due to multiple FBI Offense Code violations including losing three firearms and causing the agency to have to classify six firearms as "destroyed" because there was no record in the RFC database to account for them. The report cited to over 400 weapons being unmarked, untagged, or not entered properly, id. at 5-6, and to plaintiff repeatedly refusing or failing to comply with his supervisors and their orders, including that he

> failed to clean his office area, he failed to provide the UC with a standard operating procedure (SOP) document until after multiple orders, he refused to provide the UC with an email he sent to then-Director Mueller, he continued to provide firearms information to FBI employees after being ordered by his UC to cease doing so, he refused to train two FTU employees after he was transferred to another position, he failed to provide the UC with the information she required to supervise Tweed and to assess FTU programs, and he refused to acknowledge another FTU employee as the Program Manager and failed to provide the information the Program Manager needed to do his duties. Id. at 6.

He was also cited for committing security violations by keeping a "shadow" notebook at his home containing the serial numbers of weapons the FTU received for the disposition program, including

sensitive data about serial numbers associated with terrorism cases, and performing unauthorized searches for firearms, id. at 6-7; misrepresenting whether firearms were inventoried and whether he searched for information related to the missing weapons, id. at 7; and lacking professionalism that called into question his judgment, id. at 7-8. In sum, the OPR concluded:

> Tweed's misconduct goes to the heart of his duties and responsibilities as an FBI employee. He has failed to conduct himself with the utmost integrity and professionalism at all times. Tweed has repeatedly demonstrated a blatant disregard for Bureau rules and policies and an unwillingness to conform to the standards expected by an FBI employee. He is a liability to the FBI, and his conduct disqualified him from further Bureau employment. Based on the circumstances in this case, OPR staff recommends to the AD, OPR, that Tweed be dismissed from the rolls of the FBI for his 3.4, 5.11, 5.18, 2.5, and 5.22 offenses. Id. at 16.

On November 13, 2013, Scott Smith ("Smith"), Section Chief of Human Resources, sent a letter to plaintiff suspending him indefinitely without pay because Paul White ("White"), Section Chief of the INSD, suspended plaintiff's Top Secret security clearance. Def. Br., Ex. 2 [Dkt. No. 13-2] 1. The letter stated that "[i]t has been a longstanding essential condition of employment that employees of the [FBI] be able to obtain and maintain a Top Secret security clearance," and because plaintiff's clearance was suspended, he did "not meet an essential condition of employment." Id. at 1. The next day, White sent a follow-up letter to plaintiff explaining that his security clearance was suspended due to the substantiated allegations of inappropriate personal conduct developed during the INSD investigation, including "loss of weapons, insubordination, security violation, lack of candor, and unprofessional conduct." Def. Br., Ex. 1 [Dkt. No. 13-1] 1-2. On November 14, 2013, Timothy J. Dowling ("Dowling"), Chief of the OPR, proposed to the AD of the OPR, that plaintiff's employment be terminated after considering his written and/or oral responses. Ex. MM [Dkt. No. 1-39] 10.

In response to the proposal for removal, the AD followed procedure by allowing plaintiff to respond. Plaintiff provided two sets of written responses and gave an oral presentation to Candice

7

Will ("Will"), AD of the OPR, who had no previous involvement in the investigation. Ex. NN [Dkt. No. 1-40] 1-3. On April 10, 2014, after considering the INSD's report, the OPR's recommendation, and plaintiff's written and oral responses, Will terminated plaintiff from the FBI on the same grounds on which his security clearance had been suspended. Id. at 17. The removal letter stated that if he wished to appeal his removal, "<u>within ten (10) calendar days following notification of OPR's final decision, [he] must forward a brief statement that [he] intend[s] to appeal</u> to the [AD]...." Id. at 18 (emphasis in original). Plaintiff did not appeal his removal.

### B. **Plaintiff's EEO Activity**

Plaintiff claims to have engaged in two acts of protected activity for which he believes he suffered retaliation, that he used work time for a previous EEO matter in Louisville in 2011 and that he signed the July 2013 letter demanding rights for Christian employees.

On February 8, 2011, plaintiff was charged with eight hours of annual leave for an unscheduled absence from work to prepare for an upcoming and unrelated "EEOC hearing" scheduled from March 3 to March 4, 2011 when he "did not request or seek pre-approval for his absence." Compl. [Dkt. No. 1] ¶ 35; Ex. B [Dkt. No. 1-3] 1. On February 10, 2011, Seubert advised LD Administrative Unit Chief Rachel K. Grote ("Grote") that plaintiff had not discussed his need to use official time to prepare for the EEOC hearing and did not request pre-approval to do so. Ex. B [Dkt. No. 1-3] 1. Grote and Seubert met with plaintiff on February 11, 2011 where he explained that he was unaware of any requirement to seek prior written approval to use official time to work on an EEOC case and previously did not need to seek pre-approval for EEO matters while on official time. Id. at 1-2. Plaintiff subsequently spoke with Sean Murphy ("Murphy"), who advised him that the EEO policy for leave was not "on the books and currently being drafted." Id. at 2. EEO attorneys determined that plaintiff would have to use eight hours of leave time for his absence. Id.

There is no evidence in the record that plaintiff contested this resolution of the matter or filed any kind of EEO complaint concerning having to use eight hours of annual leave. The second protected activity involved plaintiff signing the July 16, 2013 letter concerning discrimination of Christian employees, which was sent to then-Director Comey. Compl. [Dkt. No. 1] ¶ 96.

On January 10, 2014, several months after plaintiff's security clearance was suspended and his employment indefinitely suspended, plaintiff filed an EEO complaint with the FBI's Complaint Adjudication Office ("CAO") alleging that he had been discriminated against because of his sex, religion, sexual orientation, and prior protected activity in violation of Title VII. Compl. [Dkt. No. 1] ¶ 16; Def. Br., Ex. 4 [Dkt. No. 13-4] 1-7. On March 26, 2014, the CAO accepted the following claims for investigation:

> Whether complainant was discriminated against based on religion (Pentecostal Protestant), sex (male), sexual orientation (heterosexual), and reprisal for participation in protected EEO activity when:
>
> 1) in October 2013, he learned that he was the subject of an internal investigation involving varied false accusations, one of which included causing the loss of FBI weapons;
>
> 2) on October 28, 2013, he was forced by his chain of command to attend the appointment for his polygraph examination; during his polygraph examination appointment, he was subjected to adverse treatment, including but not limited to: denied documents or written justification; told his home could be searched; told that this would become a criminal matter; and threatened by the lead investigator who said she would "take (him) out"; and
>
> 3) on November 15, 2013, his security clearance was suspended, causing his employment to be suspended indefinitely. Def. Br., Ex. 5 [Dkt. No 13-5] 3-4.

No other issues were involved in that EEO complaint. After an investigation, the CAO denied the complaint and provided plaintiff with a copy of its report which included a notice of his right to request a hearing before an EEO administrative judge; however, plaintiff failed to provide a formal written statement or to request a hearing within the requisite timeframe provided in 29 C.F.R. §

1614.108(f). Id. at 4 n.2; Def. Br., Ex. 6 [Dkt. No. 13-6] 2. On April 1, 2015, the CAO issued a final agency decision finding that plaintiff was "not discriminated against on the basis of sex, religion, sexual orientation or in retaliation for engaging in protected activity" because he had not shown "on this record that the reasons given for investigating his conduct and ultimately suspending his employment were pretexts for unlawful discrimination. The evidence overwhelmingly support[ed] a finding that FBI managers were genuinely (and understandably) concerned about potentially missing firearms property and evidence, and that [his] conduct during the investigation warranted exploring additional avenues of investigation. The investigation's findings then provided a clear reason for suspending and ultimately dismissing complainant from employment." Def. Br., Ex. 5 [Dkt. No. 13-5] 1, 13.

Plaintiff filed an appeal to the United States EEOC and, on April 3, 2017, the EEOC's Office of Federal Operations affirmed the FBI's final agency decision. Compl. [Dkt. No. 1] ¶¶ 18-19; Def. Br., Ex. 6 [Dkt. No. 13-6] 1-7. Plaintiff filed a request for reconsideration, Compl. [Dkt. No. 1] ¶ 20, which was denied on September 8, 2017, id. at ¶ 21; Def. Br., Ex. 7 [Dkt. No. 13-7] 1-6. He then timely filed his Complaint in this court.

## II. DISCUSSION

### A. Motion to Dismiss Under Rule 12(b)(1)

Defendant first moves to dismiss plaintiff's Complaint under Fed. R. Civ. P. 12(b)(1) on the basis that the Court lacks subject-matter jurisdiction over plaintiff's claims. Def. Br. [Dkt. No. 13] 2. Specifically, defendant argues that plaintiff failed to exhaust the majority of the claims raised, which deprives the Court of jurisdiction to consider such claims, and that any exhausted claims necessarily involve the INSD investigation and decision to revoke plaintiff's security clearance, which are barred under Dep't of the Navy v. Egan, 484 U.S. 518, 530-34 (1988) (foreclosing judicial review of claims related to or arising out of investigations into security

clearances). Defendant also argues that plaintiff's RFRA claim is preempted by Title VII and that this Court lacks subject-matter jurisdiction with respect to his Virginia state law claims under Egan and, furthermore, because he did not bring them under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. ("FTCA").

Under Fed. R. Civ. P. 12(b)(1), a civil action must be dismissed whenever the court lacks subject matter jurisdiction. A plaintiff has the burden to prove subject-matter jurisdiction, Demetres v. East West Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015), and the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," In re KBR, Inc., 744 F.3d 326, 333 (4th Cir. 2014) (internal quotation marks omitted).

## B. Title VII Claims

A Title VII claim may not be considered by a district court unless that claim has first been exhausted administratively, meaning that a plaintiff must first timely present the particular claim to the appropriate administrative agency. Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). Any unexhausted claim must be dismissed for lack of jurisdiction. Id.

When plaintiff filed his EEO complaint, he raised only three specific claims concerning gender- and religion-based discrimination and retaliation: 1) being subject to an internal investigation involving false allegations, including that he lost FBI weapons; 2) that he was forced to take a polygraph; and 3) that his security clearance was suspended, causing him to be suspended from employment. Defendant correctly argues that to the extent the Complaint references multiple other acts of alleged discrimination or retaliation, such as plaintiff being transferred to a different section and being replaced by a female, Compl. [Dkt. No. 1] ¶ 92(a)-(l), such claims are barred. In his opposition, plaintiff failed to address the exhaustion argument at all. Given the broad range of

allegations in the Complaint which did not fall within the three areas presented to the EEOC, those claims must be dismissed.

Defendant's primary argument, which clearly resolves all the Title VII causes of action whether or not they were exhausted, is that the Court does not have jurisdiction to consider either the defendant's decision to start an internal investigation into whether plaintiff was a security risk, the manner in which that investigation was conducted, or the final decision to terminate plaintiff's employment after his security clearance was suspended. Kruise v. Fanning, 214 F. Supp. 3d 520, 525 (E.D. Va. 2016). The Kruise opinion relied on Becerra v. Dalton, 94 F.3d 145 (4th Cir. 1996) which, like plaintiff's Complaint, involved an allegation that a security investigation of a government employee was based on false information and was motivated and taken in retaliation for the employee's EEO complaints. In rejecting the claim, the Fourth Circuit held that "the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference..." because "if permitted to review the initial stage of a security clearance to ascertain whether it was a retaliatory act, the court would be required to review the key issues the Supreme Court has held are non-reviewable." Becerra, 94 F.3d at 149. In short, "if an adverse employment decision relates to a security clearance decision and employment was conditional upon maintaining a security clearance, courts must dismiss the claim for lack of subject[-]matter jurisdiction." Clarke v. DynCorp. Int'l., LLC, 2014 WL 4269075, at *4 (D. Md. Aug. 28, 2014).

Plaintiff does not dispute that maintaining a security clearance was a requirement for continued employment with the FBI and admitted so in his EEO complaint, "my clearance was suspended indefinitely [and] this took away my ability to work." Def. Br., Ex. 4 [Dkt. No. 13-4] 4.

Therefore, based on the holdings in Egan and Becerra, this Court lacks jurisdiction to consider plaintiff's Title VII claims of discrimination and retaliation, both of which must be dismissed.

Even if the Court were not barred from considering plaintiff's Title VII claims, the defendant's arguments concerning the failure of plaintiff to allege a plausible claim of discrimination based on gender or religion would have been found meritorious. Without direct evidence of discrimination, for which there is none in this action, a complaint must allege sufficient facts to make out the four elements of a prima facie case of discrimination, which are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) aff'd by 566 U.S. 30.

In defendant's memorandum in support of his motion and his reply brief, defendant thoroughly articulated why plaintiff has failed to allege facts establishing an adverse employment action other than the investigation which led to the suspension of his security clearance and termination from employment, actions which as explained above cannot be considered by the Court. All the other alleged adverse actions, such as being transferred to another position, the FBI's failure to discipline plaintiff's former supervisor, or that plaintiff was treated rudely by coworkers, did not result in a decrease to his salary or pay grade and therefore do not qualify as adverse actions. James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004). As this Court has made clear, "complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's supervisors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII." Qaiser v. Small Bus. Admin., 2016 WL 8711622, at *11 (E.D. Va. Mar. 18, 2016). The Complaint also failed to allege facts sufficient to make a plausible claim that the defendant treated any non-male or non-Pentacostal Christian

employees who are similarly situated to plaintiff differently and that plaintiff was performing his job satisfactorily. In fact, plaintiff actually concedes that there were problems with his work performance.

Even if the Complaint had adequately alleged a prima facie claim of discrimination, the facts admitted by plaintiff in the Complaint and the exhibits attached to his Complaint clearly show that the investigation into his conduct and the decision to terminate him were not pretextual. A plaintiff can demonstrate "prextet by establishing that the [employer's] reasons [for terminating the plaintiff] are 'unworthy of credence' or by presenting other evidence 'sufficiently probative of [employment] discrimination.'" Duffy v. Belk, Inc., 477 Fed. App'x 91, 96 (4th Cir. 2012) (quoting Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004)). Plaintiff cannot point to a single reference by defendant that would allow this Court to infer that defendant's reasons for plaintiff's termination were unreliable or that his gender or religion played any, let alone a dispositive, role in his termination. Id. at 97. Instead, plaintiff admits that there were weapons missing from the inventory for which he was responsible (although he blames others for the problem), Compl. [Dkt. No. 1] ¶¶ 60-63, that he kept a personal notebook detailing firearm information and gave it to his wife, id. at ¶ 71, and that he refused to retake a polygraph examination after his superiors ordered him to do so, id. at ¶¶ 80, 83. This conduct was among the conduct cited for the suspension of plaintiff's security clearance and, clearly, it provides no basis for claiming pretext.

As for the retaliation claim, it also fails under Rule 12(b)(6) because there must be a temporal proximity between any protected activity and the resulting adverse action. The elements of a prima facie retaliation claim are: 1) engaging in a protected activity; 2) an adverse employment action; and 3) a causal link between the protected activity and the employment action. See Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004). Plaintiff has alleged engaging in two

14

protected actions – using work time in February 2011 for an unspecified EEO matter and signing the letter sent on July 16, 2013 complaining about the treatment of Christian employees. The adverse action he cites as retaliatory consists of being charged eight hours of accrued leave for the 2011 incident, being investigated and "interrogated" in 2013 about the missing firearms and other problems with the firearm inventory (which included being compelled to take a polygraph), losing his security clearance, and ultimately being terminated. The 2011 EEO incident was not exhausted and would be time barred. To the extent plaintiff argues that his signing the Christian employee letter was protected activity, that occurred in July 2013, nearly two months <u>after</u> the investigation into the missing firearms began on May 22, 2013 and <u>after</u> an audit of his work and the formal INSD investigation began. Therefore, there could not have been any causal relationship between plaintiff signing the letter complaining about the treatment of Christian employees and the decision to investigate him.[7] For these reasons, even if the retaliation claim were not barred under <u>Egan</u>, it would fail under Rule 12(b)(6).

### C. RFRA Claim

The RFRA provides that "governments should not substantially burden religious exercise without compelling justification." 42 U.S.C. § 2000bb(3). "To establish a claim under RFRA, a plaintiff must show that defendant's action 1) substantially burdens 2) plaintiff's religious exercise." <u>Godbey v. Wilson</u>, 2014 U.S. Dist. LEXIS 25436, at *23-24 (E.D. Va. Feb. 26, 2014).

---

[7] On July 17, 2018, plaintiff filed a Second Brief of Recently Discovered New Evidence [Dkt. No. 30], which consists of an email dated May 24, 2017 to one of plaintiff's email accounts from a retired FBI special agent who signed the same letter and claims she was "nudged" into retirement in December 2015, an action she attributes to anti-Christian bias. Neither this letter nor an apparent typographical error in Exhibit C make a material difference to this analysis because, as stated above, the investigation into plaintiff's handling of firearms started months before he signed the letter. As for Exhibit C, an exhibit plaintiff attached to the Complaint, although the last few pages used a different case ID number and date, any fair reading of that document shows that all of it related to plaintiff. Therefore, nothing in this late-filed brief changes the Court's conclusion.

The single allegation in the Complaint concerning the RFRA is that plaintiff's use of "religious and inspirational quotes on the signature line of his emails were characterized [by an FBI employee] as threatening when no actual threat existed within the communication or the quote." Compl. [Dkt. No. 1] ¶ 102. That one allegation fails to allege any element of a RFRA claim because plaintiff does not allege how including "religious quotes" at the end of his emails qualifies as a "religious exercise." Moreover, there are no allegations in the Complaint or evidence in this record indicating that defendant took any action that substantially burdened plaintiff's exercise of his religion or that the complaints about his use of quotes played any material role in the decision to investigate his conduct, revoke his security clearance, or terminate his employment with the FBI. Lastly, as defendant correctly argues, Title VII claims preempt RFRA claims to the extent they relate to employment decisions. Because plaintiff has failed to state a claim for a RFRA violation, Count 3 will be dismissed.[8]

### D. Virginia State Law Claims

Count 4 alleges that defendant intentionally inflicted emotional distress and tortiously interfered with a prospective economic advantage in violation of Virginia state law. Compl. [Dkt. No. 1] ¶¶ 103-10. Specifically, the Complaint alleges that plaintiff suffered severe emotional distress during the INSD investigation when he was confined and was told that he was going to be prosecuted. Id. ¶ 105. He also complains that the FBI "did not complete a full security investigation" and as a result he can no longer obtain federal employment based on the investigation and revocation of his security clearance. Id. ¶¶ 108-10. Defendant points out that these tort claims appear to be attempts to allege FTCA violations; however, "individual government officials may not be sued under the FTCA; the only proper defendant is the United

---

[8] Plaintiff did not address defendant's RFRA argument at all in his opposition.

States of America." Godbey, 2014 U.S. Dist. LEXIS 25436, at *12-13; see also Iodice v. United States, 289 F.3d 270, 273 n. 1 (4th Cir. 2002) ("[T]he parties and the magistrate judge agree that the United States is the only proper defendant" in the FTCA action). Therefore, plaintiff's state law claims, if deemed as brought pursuant to the FTCA, must be dismissed for lack of jurisdiction because he failed to name the United States as a defendant. An even stronger basis for concluding that the Court lacks jurisdiction over these claims is that they also necessarily involve the investigation and decision to revoke plaintiff's security clearance and all the alleged damage to plaintiff arises from the FBI's conduct during the investigation resulting in his security clearance being terminated and the resulting termination from employment, which conduct is barred from judicial review. Egan, 484 U.S. at 529-30; Becerra, 94 F.3d at 149. Accordingly, the claims in Count IV will be dismissed.[9]

### III. CONCLUSION

For the reasons stated above, defendant's Motion to Dismiss for Lack of Jurisdiction [Dkt. No. 11] will be granted as to Counts 1, 2, and 4 and Motion to Dismiss for Failure to State a Claim [Dkt. No. 12] will be granted as to Count 3 by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 18 day of July, 2018.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge

---

[9] Plaintiff failed to address defendant's arguments as to his Virginia state law claims in his opposition.

17